UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

NORFOLK SOUTHERN RAILWAY
COMPANY,

    Plaintiff,

    v.

SOO LINE RAILROAD COMPANY, et al.,

    Defendants.

Case No. 2:17-CV-15-GSL

## OPINION AND ORDER

This is a declaratory action by a railroad seeking a determination of its rights under a private contract, the Indiana Harbor Belt Interchange Agreement (IHBIA). On January 12, 2017, Plaintiff Norfolk Southern Railroad Company ("Norfolk Southern") filed a Complaint [DE 1] against Defendants Soo Line Railroad Company, d/b/a Canadian Pacific Railway ("Canadian Pacific" or CPKC),[1] Indiana Harbor Belt Railway Company (IHB), and Consolidated Rail Corporation ("Conrail" or CR), seeking a declaration that it may invoke the ninety-day termination provision under the IHBIA despite only being a consenting signatory to the agreement.[2]

---

[1] Defendant Canadian Pacific was previously known as, and referred to in each Complaint as, Canadian Pacific Railway Limited. In 2023, the company underwent a merger with Kansas City Southern (KCS) and became Canadian Pacific Kansas City Limited (CPKC). [See DE 185 at 1 n.1]. The parties' later filings refer to Canadian Pacific as either CP or CPKC, but for purposes of consistency the Court will instead refer to this party as "Canadian Pacific."

[2] The Complaint was later amended twice [see DE 4; DE 83], and while the parties and requested relief remained consistent, factual stipulations between the parties were included in the latest version. [See DE 83-1].

After receiving the parties' stipulations [DE 83; DE 165], holding a bench trial from February 24, 2025, to February 25, 2025[3] [DE 174–75], observing the witnesses at trial and reviewing the trial exhibits, and considering the Proposed Findings of Fact and Conclusions of Law submitted by the parties in their post-trial briefs [DE 182; DE 184], the Court now enters the following written findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Furthermore, after day one of the bench trial, Canadian Pacific filed a Motion for Judgment on Partial Findings under Federal Rule of Civil Procedure 52(c) [DE 167]. Canadian Pacific thereafter filed a Motion to Reconsider the Court's Opinion and Order [DE 118] denying Canadian Pacific's request for summary judgment. [DE 181]. Because these Motions raise the same substantive arguments as those addressed in the parties' post-trial briefs, the Court will incorporate those arguments and address the Motions as part of its conclusions of law.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 52(a)(1), in "an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "This means that 'there must be findings, stated either in the court's opinion or separately, which are sufficient to indicate the factual basis for the ultimate conclusion.'" *Rucker v. Higher Educ. Aids. Bd.,* 669 F.2d 1179, 1183–84 (7th Cir. 1982) (quoting *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943)). The findings requirement under Rule 52(a)(1) serves a dual purpose: "(1) to provide appellate courts with a clear understanding of the basis of the trial court's decision, and (2) to aid the trial court in considering and adjudicating the facts." *Freeland v. Enodis Corp.*, 540 F.3d

---

[3] Defendants Conrail and IHB did not participate in the bench trial. [*See* DE 174 at 3:18–4:12].

721, 739 (7th Cir. 2008) (quoting *Bartsh v. Nw. Airlines, Inc.*, 831 F.2d 1297, 1304 (7th Cir. 1987)). Findings by the Court "are adequate if they are sufficiently comprehensive to disclose the steps by which the trial court reached its ultimate conclusion on factual issues." *Bartsh*, 831 F.2d at 1304. "[F]indings on every issue presented in a case are unnecessary if the trial court has found such essential facts as lay a basis for the decision." *In re Lemmons & Co.*, 742 F.2d 1064, 1070 (7th Cir. 1984). "The normal standard of proof in a civil case is, of course, proof by a preponderance of the evidence." *Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir. 1992).

Finally, while the Court's legal conclusions are subject to *de novo* review by the Seventh Circuit, the Court's findings of fact and application of law to those findings will be reversed only for clear error. *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001); *see also* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous . . . ."); *Ill. Liberty PAC v. Madigan*, 904 F.3d 463, 475 (7th Cir. 2018) ("The clear-error standard for factual findings entered after a bench trial is highly deferential.") (internal quotation marks omitted).

## FINDINGS OF FACT

At trial, the Court heard testimony from the following witnesses (in order of testimony):

- Charles Hubbard, former director of interline and passenger for Defendant Canadian Pacific;

- Randall Hunt, former assistant director of joint facilities and interline and current senior director of operations safety for Plaintiff Norfolk Southern;

- Nicholas Walker, senior vice president of operations (east region) for Defendant Canadian Pacific;

- Randall Hunt, rebuttal witness.

The following findings of fact are based on the parties' stipulations, admitted exhibits, and the testimony elicited during the trial.

### I.     Parties

Norfolk Southern and Canadian Pacific are Class I railway freight companies managing major railroad operations throughout the United States.[4] [DE 175 at 249:12–13; DE 183-5 at 1]. Conrail is a joint subsidiary owned by Norfolk Southern and CSX Transportation Co. (CSXT), both of whom control Conrail's Northeast and Midwest operations as its sole shareholders. [DE 174 at 61:19–21, 123:11–24]. IHB is a Class III short line railroad located within the Chicago/Northwest Indiana region. [DE 175 at 190:6–8].

Relevant to the agreements discussed below, Norfolk Southern owns track between Control Point 502 ("CP-502") and Gibson Crossing (collectively, "the North/South line") just outside of Gibson Yard in Northwestern Indiana. [DE 165 at 32, ⁋ 2]. Under a longstanding agreement with Norfolk Southern, IHB maintains and operates the track between CP-502 and Gibson Crossing.[5] [*Id.* at ⁋ 3; DE 184 at 1, ⁋ 2]. Conrail owns the track between Gibson Crossing and Gibson Yard, also located in Northwestern Indiana. [DE 165 at 33, ⁋ 6]. IHB similarly maintains and operates this portion of track through an agreement with Conrail. [*Id.*, ⁋ 7]. IHB does not have an independent right to grant access to third parties over NS or Conrail-owned tracks. [*Id.*, ⁋⁋ 5, 9]. A map depicting the relevant tracks and ownership is shown below:

---

[4] According to the Surface Transportation Board, the federal agency assigned jurisdiction over the regulation of surface transportation and freight rail, as well as 49 C.F.R. § 1201(1-1)(a) (2021), Class I freight carriers are classified as those having an operating revenue of $900 million or more. Class III carriers are classified as carriers having an operating revenue of $40.4 million or less. *Id.*

[5] According to testimony from Norfolk Southern's corporate representative, Randall Hunt, IHB has managed the track in and around Gibson Crossing for Norfolk Southern and its predecessors since 1907. [DE 174 at 122:18–25]. IHB's management arrangement functions similar to a lease, in that IBH operates the property as its own railroad. [*Id.* at 123:1–10]. The caveat to this arrangement, however, is that consent to admission of third-party users resides solely with the respective owners of the managed properties, in this case Norfolk Southern, Conrail, and CSXT. [*Id.*; DE 165 at 33, ⁋ 4].



[DE 174, Ex. 11].

## II.  Negotiated Agreements

### A.  Pre-Agreement Background (1985–2004) and the Memorandum of Understanding (MOU)

Prior to making the relevant interfacing arrangements with Norfolk Southern, Canadian Pacific operated from Detroit to Chicago through a 1985 haulage agreement[6] with CSXT. [*Id.* at 34:17–25, 59:7–10]. This agreement permitted for some access rights over two control points, including the route from CP-502 to Gibson Crossing. [*Id.* at 17:24–18:7]. In 1990, Canadian Pacific purchased the Delaware & Hudson Railroad ("D&H"), a short line railroad located in the

---

[6] A "haulage agreement" is an arrangement where one party's traffic is transported while the host railroad handles the train, including powering and piloting the train with its own crewmen and engineer. [DE 174 at 59:11–17]. According to Canadian Pacific's corporate designee, Charles Hubbard, this arrangement was satisfactory but came at the cost of no direct supervision over crewmen operating the train. [*Id.* at 59:18–25].

Northeastern United States. [*Id.* at 60:5–14]. Although Canadian Pacific attempted to use the D&H to extend Canadian Pacific's market into the Northeast, it "didn't fit real well within [its] itinerary of properties." [*Id.* at 60:25–61:2]. Market interest from third-party railroad companies developed over time, including from Norfolk Southern. [*Id.* at 60:15–21]. Canadian Pacific solicited offers from third-party suitors, turning some down in the process, but did not actively pursue any of them. [*Id.* at 61:2–9].

Around 2003, however, Canadian National Railroad ("Canadian National") offered around $100 million for D&H. [*Id.* at 38:6–20, 61:2–9]. Canadian National realized that the rail structure of the D&H was the shortest and fastest route from Eastern Canada into the Northeastern United States and, wanting to extend its market into the Northeast territory, wished to capitalize on this property. [*Id.* at 61:10–18]. Following Norfolk Southern's purchase of Conrail in 1997, and thus Norfolk Southern's extension into the Northeast and East Coast, a concern over Canadian National's presence in the region developed. [*Id.* at 61:22–25]. Norfolk Southern's CEO and Canadian Pacific's CEO, both of whom had a good working relationship at the time, discussed the concern over Canadian National's interest in the D&H. [*Id.* at 61:22–25]. Recognizing that Canadian National's offer could not simply be declined without an alternate course of action in place, Norfolk Southern and Canadian Pacific engaged in several business meetings to propose a means of offsetting the $100 million offer. [*Id.* at 62:1–4]. Consequently, Canadian Pacific did not sell the D&H to Canadian National and the relevant agreements took formation instead. [*Id.* at 62:5–12].

Norfolk Southern and Canadian Pacific signed a Memorandum of Understanding (MOU) on June 30, 2004. [*Id.* at 62:17–63:3; Ex. 19]. The purpose of the MOU was for Norfolk Southern to reciprocate the value Canadian Pacific declined from the Canadian National offer

through either enhanced non-freight revenues or increased efficiencies, or a combination of both. [*Id.* at 39:6–22, 60:22–62:18]. Norfolk Southern would also benefit through decreased costs, continued use of the D&H, and the exclusion of Canadian National from the Northeast market. [*Id.* at 39:23–40:6]. These decreased costs were considered an "exchange of value." [*Id.* at 38:2–5]. To provide further value from Norfolk Southern to Canadian Pacific, and to otherwise execute mutually advantageous business deals, the MOU identifies six "related agreements" detailing the process for developing final and complete agreements. [*Id.*, Ex. 19].

### B. Michigan Trackage Rights Agreement (MTRA)

The first agreement listed in the MOU is the Michigan Trackage Rights Agreement (MTRA), entered into on June 2, 2005. [*Id.*, Ex. 19; Ex. 6]. The MOU explains the purpose of the MTRA is to give Canadian Pacific access to the following:

> [Norfolk Southern] shall grant [Canadian Pacific] . . . overhead trackage rights between Delray Interlocking (Delray Tower) in Detroit and the following two points in Chicago: CP-502 (for further movement to and from the Indiana Harbor Belt Railroad) and CP-509 (for further movement to the Belt Railway of Chicago) (the "Michigan Trackage Rights") generally by way of the former Wabash line out of Detroit, MI to Butler, IN, then via the former Conrail route from Butler past Elkhart Yard and then into Chicago via the [Norfolk Southern] Chicago Line. [Canadian Pacific] shall determine on a day to day, train to train, basis whether to use Chicago routes via CP-502 or CP-509 and [Norfolk Southern] shall make its best efforts to accommodate [Canadian Pacific's] requested routing.

[*Id.*, Ex. 19 at § I.A]. The MOU further details the MTRA's purpose as:

> (a) bridging [Canadian Pacific] traffic of all commodities that originates or terminates on [Canadian Pacific] points east of, but not including, Detroit and CP-502 and CP-509 in Chicago (including trackage rights over other carriers) . . . ; and (b) handling [Canadian Pacific] Intermodal Traffic between a [Canadian Pacific] Legacy Point . . . and Livernois Yard in Detroit, moving via Chicago, and not interlined in the United States (directly or indirectly) with Union Pacific, BNSF, [Canadian National], [CSXT] or any other carrier.

[*Id.*, Ex. 19 at § I.B.1].

Within the MTRA itself, the parties agreed to the following grant of rights:

> [Norfolk Southern] grants to [Canadian Pacific] the right to operate its trains, locomotives, cars and equipment with its own crews (such rights being referred to hereinafter as the "Subject Trackage Rights") over the following route on [Norfolk Southern] railroad lines . . . between Delray Interlocking in Detroit, MI . . . and one of the following two points in Chicago, IL . . . (i) CP-502 at Milepost 502.8± and (ii) CP-509 at Milepost 509.7±[.]

[*Id.*, Ex. 6 at § 1(a)]. The map below outlines the trackage rights granted to Canadian Pacific under the MTRA:



[*Id.*, Ex. 6]. The MTRA also expressly grants Canadian Pacific the right to determine which control point[7] to use:

> [Canadian Pacific] shall determine on a day-to-day, train-by-train, basis whether to enter and exit the Subject Trackage via CP-502 or CP-509 or such other End Point(s) in the vicinity of Chicago as may be permitted by this Michigan Trackage Rights Agreement.

---

[7] The "control point" is the physical intersection of tracks where signals stationed at the intersection only permit a carrier to proceed if the carrier possess the rights to do so. [DE 174 at 67:25–68:13].

8

[*Id.*, Ex. 6 at § 2(c)].

By granting these rights to Canadian Pacific, the MTRA conveyed value, as envisioned by the MOU, in two ways. First, the MTRA granted "trackage rights," which was a marketable improvement over the haulage rights Canadian Pacific already possessed through its 1985 agreement with CSXT. [*Id.* at 65:24–66:6]. In particular, the MTRA line or North/South line was "like a racetrack" because it was flat, did not have grades, and did not require as much power or fuel. [*Id.* at 64:15–22]. Further, the option of having two routes through the Chicago terminal— one of the busiest terminals in North America—was important because it mitigates congestion from traffic and weather. [*Id.* at 64:23–65:4]. Second, the MTRA contained a sub-market rate to be paid by Canadian Pacific to Norfolk Southern for the right to move over Norfolk Southern's tracks. [*See id.* at 60:22–62:18, 66:7–12; Ex. 6 at §§ 5(a)–(b)]. Finally, the MTRA, and thus the parties' contractual obligations thereunder, had an initial term of twenty-five years, with an option for Canadian Pacific to extend an additional ten years, before the agreement would either terminate or require renegotiation. [*Id.*, Ex. 6 at § 13(b)]. Accordingly, should the initial option to extend be invoked, the MTRA would remain effective through at least 2040. [*Id.*].

## C.  Indiana Harbor Belt Interchange Agreement (IHBIA)

When the MTRA was executed on June 2, 2005, traffic immediately began rolling out on the CP-509 route and has continued to the present day. [*Id.* at 71:25–72:4]. As for the CP-502 route, this would require another arrangement to exit the line. [*Id.* at 72:5–12]. When the MOU was originally negotiated, the parties found it difficult to determine who owned which portion of tracks and who controlled them. [*Id* at 73:1–5]. Both Canadian Pacific and Norfolk Southern understood that Canadian Pacific lacked the ability to use CP-502 to access Gibson Yard because Canadian Pacific did not have the operating rights over the IHB. [*Id.* at 72:5–73:19, 144:23–

145:6]. To effectuate the exchange of value and rights conferred under the MTRA, and because both Canadian Pacific and Norfolk Southern wanted the MTRA to work, it was understood that Canadian Pacific would need to traverse tracks operated by the IHB and owned in part by Conrail. [*Id.* at 15:19–24, 72:5–73:19]. This in turn was the genesis of the agreement that would become the IHBIA. [*Id.* at 72:9–12].

On July 15, 2005, just six weeks after executing the MTRA, Canadian Pacific and IHB entered into the IHBIA, an interchange agreement[8] allowing Canadian Pacific to access and run rail traffic between Conrail-owned track in Gibson Yard to Norfolk Southern's CP-502 eastbound, or from CP-502 westbound to Gibson Crossing and into Gibson Yard for interchange of Canadian Pacific's traffic with either Norfolk Southern or Western rail or intermodal carriers such as Union Pacific or BNSF. [*Id.* at 74:2–15; Ex. 17]. The following map details the tracking rights conferred to Canadian Pacific:

---

[8] An "interchange agreement" is one type of "interline agreement" (also functionally described as a "joint facility" agreement). [DE 174 at 13:6–15]. An interline agreement is generally described as the interrelationship between one or more other railroads (i.e., the sharing of facilities), as well as the envisionment and embodiment of trackage, haulage, terminal, switching, and short line rights. [*Id.* at 13: 6–12]. An interchange agreement, in contrast, does not confer trackage rights but rather is directly confined to the interchanging of equipment or cars with one or more series of railroads. [*Id.* at 13:23–14:6].



[*Id.*, Ex. 13].

The IHBIA was originally signed by IHB and Canadian Pacific without Norfolk Southern's involvement, but by August 2005 the parties reached out to Norfolk Southern and Conrail to obtain their consent to use their tracks. [*Id.* at 107:1–4, 147:17–25; Ex. 35]. After several rounds of negotiation and drafting, Conrail and Norfolk Southern were added to the IHBIA as "consent[ing] parties" due to their ownership of the relevant tracks, but did not bear any interchange obligations. [*Id.* at 72:5–73:19, 147:17–25]. The effective date on all versions of the agreement remained the same: July 15, 2005. [*See id.* at 110:23–111:3; Ex. 17].

11

In addition, the IHBIA provided for a termination provision allowing either Canadian Pacific or IHB—the only parties with operational obligations—to terminate upon giving ninety days' notice:

> This Agreement becomes effective at 0001, Friday July 15, 2005 and shall continue in full force and effect until terminated as provided herein, provided, however; that either IHB or [Canadian Pacific] shall have the right to terminate this agreement upon giving ninety (90) days advanced written notice to the other parties.

[*Id.*, Ex. 17 at § 11].

The IHBIA, together with the MTRA, permitted Canadian Pacific to move trains and equipment generally from Detroit to Chicago via CP-502 and CP-509, and to Gibson Yard via CP-502. [*Id.* at 66:13–70:10]. The IHBIA references the rights conferred to Canadian Pacific under the MTRA:

> **WHEREAS**, *[Canadian Pacific] has received trackage rights between Eastern Canada and CP 502 for interchange with IHB*, and **WHEREAS**, for operating convenience IHB and [Canadian Pacific] desire said interchange to take place at Gibson Yard, and **WHEREAS**, [Norfolk Southern] controls third party rail access between CP 502 and Gibson Crossing, and **WHEREAS**, [Conrail] CONTROLS THIRD PARTY RAIL ACCESS BETWEEN Gibson Crossing and Gibson Yard, and **WHEREAS**, the parties hereto desire to enter into a written agreement to provide for the method for said interchange, of rail traffic at Gibson Yard routed via CP 502.

[*Id.*, Ex. 17 (italics added, bold in original].

It was also understood by both parties that Norfolk Southern did not possess the rights to permit Canadian Pacific access into Gibson Yard, as premised under the MTRA, and thus the IHBIA served to effectuate this purpose. [*Id.* at 72:5–73:19; Ex. 6]. Corporate representatives for Norfolk Southern and Canadian Pacific agreed that the sole purpose of the IHBIA was, in fact, to effectuate Canadian Pacific's rights and meet Norfolk Southern's contractual obligations under the MTRA. Specifically, Canadian Pacific's corporate representative, Charles Hubbard, stated the following when asked about the IHBIA's purpose:

12

Q: And is there any reason for the IHBIA to exist other than to effectuate the rights that [Norfolk Southern] promised to provide in the MTRA?

*\*\**

A: No.

[*Id.* at 103:25–105:6]. Likewise, Norfolk Southern's corporate representative, Randall Hunt,

stated the following when asked about the IHBIA's purpose:

Q: Okay. So when the MTRA was signed, [Canadian Pacific] did not have the operational ability to use 502, correct?

A: Correct.

Q: And everybody understood that.

A: That's what the agreement says.

Q: And so it was understood that there was going to have to be a secondary grant of rights. You've learned that from your involvement, haven't you?

A: They needed additional rights.

Q: And can you think of anything that the IHBIA agreement does other than to permit [Canadian Pacific] to use Control Point 502?

A: I don't know what other arrangements [Canadian Pacific] might have in place to connect to that location. I'm not aware of anything.

Q: Let's just be real clear. You're not aware – you can't think of anything that this agreement, Exhibit 17, the IHBIA, does other than permit [Canadian Pacific] to use Control Point 502?

A: I'm not aware of another use they have.

Q: And so one of the reasons, at least one of the reasons, that [Norfolk Southern] consented to the execution of the IHBIA was so [Canadian Pacific] could use 502, right?

A: I believe that's why they sought the rights, yes.

*\*\**

13

Q: [Canadian Pacific] did not have rights to use 502 until [Norfolk Southern] gave them those rights under the MTRA, right?

\*\*\*

A: So the right of ingress and egress at 502 and 509 were contained within the MTRA.

Q: Now we're getting somewhere. And before they were contained in the MTRA, [Canadian Pacific] had no such rights?

A: [Canadian Pacific] did not get there. So, yes, that's how they got on to the Chicago line.

Q: And then the way those rights were effectuated so 502 could actually be used was the execution of the IHBIA. There's no doubt about that, is there?

A: The IHBIA was the right that allowed them to get off at 502, yes.

[*Id.* at 144:23–145:18, 162:3–163:16].

Finally, in 2014, Joe Wolfe, on behalf of Norfolk Southern executive Terry Evans, responded to an inquiry from IHB regarding a possible amendment to the IHBIA. [*Id.* at 151:2–24; Ex. 5]. After receiving agreement as to the details and language of an amended version of the IHBIA, as well as letters of consent from Conrail and CSXT, Norfolk Southern responded with the following:

Norfolk Southern is not opposed to the [*sic*] [Canadian Pacific's] request for Trackage Rights over the IHB; however, we are not agreeable to modification of the existing Interchange Agreement for trains operating between Gibson and CP 502 as this agreement is linked with the existing Michigan Trackage Agreement between [Canadian Pacific] and [Norfolk Southern].

[*Id.* at 151:2–9; Ex. 5]. During the bench trial, Norfolk Southern representative Randall Hunt was asked about this email thread:

Q: So [Norfolk Southern] internally in 2014 specifically linked the two agreements, the MTRA and the IHBIA, correct?"

A: Well, no, that's not accurate.

14

Q: Is that word not there?

A: Joe Wolf[e], who I know, and Terry Evans, who I also know, would not have used that word in a way that I think you're trying to lead the Court to believe it is being used.

Q: Is there any doubt that that's exactly the word that they used, "linked"?

A: So the word "linked in that context – because I know Joe Wolf[e] and his qualifications to use a word like that in the context that you're using it. Joe had no familiarity with these agreements. Neither did Terry Evans. I think the word "linked" in this case would be just a connection in their mind that those two things somehow impact each other.

To say that they're linked I think leads one down the path of saying that there's some reliance or that the one kind of impacts the other. I'm certain that's not how Joe Wolf[e] meant that. You'd have to ask Joe what he meant.

Speaking for Norfolk Southern now, certainly, that was not our understanding. Those agreements are not linked today. They were not linked then. His statement as, essentially, a secretary, administrative assistant, did not have any qualification to make that determination on behalf of the company.

Q: Are you done?

A: You need more?

[*Id.* at 152:10–153:11]. Immediately thereafter, an objection as to non-responsiveness was raised.

The Court, in sustaining the objection, provided the following soliloquy:

Okay. So what I am assuming has occurred is that you're asking a question where you believe that it's a yes-or-no answer with the word "linked." . . . If, in fact, your question is, as you have said, simply whether the word "link" is in the e-mail, the Court will just take notice that the document in and of itself says "link." And, again, we'll give the weight and credibility as it relates to this document, as to any other testimony that a witness gives, and will ultimately determine[] the weight and credibility to give to it.

That said, because I am showing this in the document itself, . . . I will strike the statements of Mr. Hunt as nonresponsive.

[*Id.* at 154:4–21].

When asked whether Norfolk Southern ever made a formal statement or retraction regarding this email and the use of the word "linked," Norfolk Southern responded that it had not and had only disavowed the statement during depositions in this suit. [*Id.* at 154:20–156:4]. Neither Joe Wolfe nor Terry Evans were called to testify about the email during these proceedings.

### III.    Intermission Period (2005–2014) and Oil Arbitration

For approximately ten years, Canadian Pacific operated smoothly and efficiently over CP-502 pursuant to its rights under the MTRA and IHBIA, in which Canadian Pacific received a benefit of at least $10 million per year of exchange of value and saw no material changes in traffic flow.[9] [*Id.* at 40:1–43:23]. At some point between 2013 and 2014, however, IHB delivered to Canadian Pacific at Gibson Yard a number of unit trains of tank cars loaded with crude oil originating from the BNSF Railway. [*Id.* at 81:25–82:13; *see* DE 183-5 at 5].[10] Canadian Pacific hauled the trains eastbound via CP-502 into Detroit and beyond, carrying no less than 6,380 crude oil cars prior to May 9, 2014. [DE 183-5 at 5].

In 2014, Norfolk Southern questioned Canadian Pacific about the operation of crude oil trains over CP-502 and whether this complied with the MTRA. [*Id.*]. Canadian Pacific did not respond to this letter, and Norfolk Southern subsequently notified Canadian Pacific that the MTRA did not permit the eastbound movement of crude oil trains originating from BNSF. [*Id.*].

---

[9] Canadian Pacific presumably received benefits totaling approximately $160 million between 2005 and 2021. [DE 174 at 48:1–49:5]. While Norfolk Southern agreed that it received benefits in various forms, including operational rights, trackage rights, and revenue, it never internally quantified the value of the benefits received. [*Id.* at 164:20–165:15]. Moreover, and separate from these agreements, Norfolk Southern acquired the D&H from Canadian Pacific in 2014 for approximately $214.5 million. [*Id.* at 48:19–49:8]. It is unclear of this was ever considered part of the parties' "exchanges of value."

[10] The Oil Arbitration was admitted without objection as Exhibit 23. For purposes of citation and providing pincites to facts described in the Oil Arbitration, the Court refers to Canadian Pacific's appendix to its post-trial briefing. [*See* DE 183-5].

Thereafter, Norfolk Southern blocked the movement of any crude oil trains by holding them on tracks subject to the MTRA. [*Id.*]. Canadian Pacific disputed this limitation of its operating rights under the MTRA, but desiring to continue rail services, Canadian Pacific and Norfolk Southern entered into an agreement pursuant to which Canadian Pacific would pay an access fee (in addition to fees specified in the MTRA) per car for any further movement pending resolution of the dispute. [*Id.*]. Thereafter, Canadian Pacific filed a Demand for Arbitration with the American Arbitration Association to adjudicate the scope of its rights under the MTRA. [*Id.*].

The matter proceeded through the entire arbitration process, including discovery, the taking of depositions, and a hearing. [DE 174 at 83:3–15]. At no point did Norfolk Southern contend it could terminate the IHBIA whenever it so desired; the issue was limited to the operation rights conferred under the MTRA and IHBIA. [*Id.* at 83:16–18]. The arbitration panel unanimously held in favor of Canadian Pacific and concluded that Canadian Pacific could move oil, as well as any other commodities, under the terms of the MTRA and IHBIA. [*Id.* at 84:8–17]. Specifically, the panel held that "[n]either the MTRA nor the IHBIA prevent [Canadian Pacific] traffic from entering or exiting MTRA trackage at either CP-502 or CP-509 based upon the commodity being transported, direction, or the train type (including unit trains, crude oil trains or manifest)." [DE 183-5 at 16]. Moreover, and noteworthy to the case at hand, the panel made the following findings:

(1) The IHBIA "is obviously related to the MTRA and plainly has an impact on the rights of [Canadian Pacific] under the MTRA; and

(2) The "prior/subsequent clause" under the MTRA does not categorically exclude the "operating rights" under the IHBIA, and because the agreements must be read as

17

permitting eastbound traffic on CP-502, the IHBIA's "operating rights" can properly be read as satisfying the "prior/subsequent clause" under the MTRA.

[*Id.* at 9, 11, 15]. In 2016, Canadian Pacific and Norfolk Southern also agreed to confirm the arbitration award in a court decision, which was entered on the Northern District of Illinois' docket in Cause No. 1:16-cv-9094. [*See* DE 174 at 84:18–85:12; Ex. 24].

### IV.    Current Lawsuit and Procedural History

Four months after the arbitration decision, on January 12, 2017, Norfolk Southern initiated this lawsuit seeking declaratory judgment under Indiana law[11] that it has the right to terminate the IHBIA at will. [DE 118 at 3]. On March 17, 2017, Norfolk Southern served Canadian Pacific with a written notice that it intended to terminate the IHBIA within either ninety days of the notice or ninety days following a judicial confirmation of Norfolk Southern's right to terminate, whichever occurred later. [DE 174, Ex. 22].

Following the close of discovery, Norfolk Southern and Canadian Pacific filed respective motions for judgment on the pleadings [DE 96] and summary judgment [DE 98], both of which were addressed in an Opinion and Order entered on March 31, 2023. [DE 118 at 3].[12] In its motion, Norfolk Southern argued that because the IHBIA was "stand-alone" and unrelated to the MTRA, the IHBIA lacked a definite termination provision for Norfolk Southern. [DE 96]. Accordingly, Norfolk Southern asserted it was entitled to terminate the IHBIA upon ninety-days' written notice as this was the given method for termination provided to Canadian Pacific and IHB. [*Id.*]. As for its motion, Canadian Pacific argued, in part, that the IHBIA is not a perpetual

---

[11] The operative Complaint and IHBIA both specify that Indiana law governs. [*See* DE 83 at 5].

[12] This case was previously assigned to District Judge James T. Moody, who subsequently issued the summary judgment Opinion and Order. This case was reassigned to the current presiding Judge on July 3, 2024. [DE 131].

contract because (1) the IHBIA and MTRA are contemporaneous agreements, and (2) collateral

estoppel applied because the Oil Arbitration panel (whose decision was later confirmed in a

federal court judgment) held that the MTRA and IHBIA are linked. [*See* DE 98]. Canadian

Pacific argued in the alternative that even if the IHBIA was deemed to be an indefinite contract,

under Indiana law, the IHBIA would be terminable only at a "reasonable time" and thus required

review of all surrounding equities. [*Id.*].

The Court denied both motions in full and set the case for trial. [DE 118 at 12–13]. The

Court found that the agreements were not contemporaneous, that collateral estoppel did not

apply, and that the IHBIA was a perpetual contract. [*Id.*]. The Court, however, noted that these

findings were made "*at least for purposes of this opinion*" and that neither party was entitled to

judgment "at this stage." [*Id.*]. Norfolk Southern thereafter moved to reconsider the Opinion and

Order [DE 118], but the motion was denied on the record. [*See* DE 152].

Later, on February 5, 2025, the Court held a Final Pretrial Conference. [DE 163]. During

the hearing, the Court summarized the Opinion and Order and assessed what would be presented

at trial:

> In that order, Defendant [Canadian Pacific] argued that the contracts are
> contemporaneous and, therefore, the IHBIA is not perpetual because it adopts the
> 2040 termination clause set forth in the MTRA. Judge Moody did not accept those
> arguments. The analysis begins by asking whether the IHBIA is a perpetual
> contract, which leads into Judge Moody's analysis of the contemporaneous
> contracts doctrine.
>
> Judge Moody's reasoning is clear and it is a question that, if there were a jury trial,
> that wouldn't be decided by a jury. It's a legal determination. The parties are
> different, the subject matter of the agreements is different, and though not
> dispositive, the contracts were executed at different times; so the MTRA and its
> 2040 termination provisions are not read into the IHBIA.
>
> This renders the IHBIA perpetual as to Norfolk Southern. Though the end of the
> opinion includes the language: "At least for the purposes of this opinion," when the
> order is read in its entirety, it is clear to this Court that Judge Moody decided that

the MTRA and IHBIA are not contemporaneous contracts and, therefore, the IHBIA is perpetual.

Judge Moody teed up for trial the remaining issue, what is the precise point a contractual obligation is terminated? That question of fact is all that remains. Whether the contracts are contemporaneous or whether the IHBIA is perpetual do not and will not be redecided.

I take [Canadian Pacific's] point about these not being a final decision; but at [the] summary judgment stage, the decision is whether the case proceeds to trial. This is a bench trial, and Judge Moody made legal determinations and defined the remaining factual determinations for trial so that's what the trial will be about, again, teeing up the remaining issue, what is the precise point a contractual obligation is terminated?

[DE 163 at 9:20–11:1]. Thereafter, the Court held a two-day bench trial on February 24, 2025, and February 25, 2025, in which the parties presented exhibits and testimony. [*See* DE 174–75]. At the end of the first day, and at the close of Norfolk Southern's case-in-chief, Canadian Pacific moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c). [DE 167]. The Court took the motion under advisement and, following the conclusion of the bench trial, ordered the parties to file post-trial briefs. The parties filed their briefs, along with an appendix of exhibits entered into the record during the bench trial. [*See* DE 182–84]. That material has been taken into consideration and the Court, being duly advised of the arguments and evidence presented therein, now makes the following conclusions of law.

## CONCLUSIONS OF LAW

The issue teed up for trial was at what precise point does the contractual obligation terminate? [DE 163 at 9:20–11:1]. To this end, Norfolk Southern presented its case-in-chief. At the conclusion of Norfolk Southern's case-in-chief, Canadian Pacific raised its Motion for Judgment on Partial Findings [DE 167], arguing again that the IHBIA is not a perpetual contract because the IHBIA and MTRA are contemporaneous agreements and that collateral estoppel applied. Both of these issues were previously addressed in the Court's Opinion and Order [DE

20

118] and were found in favor of Norfolk Southern. Canadian Pacific brings its Motion for Judgment on Partial Findings under Rule 52(c) of the Federal Rules of Civil Procedure, which states:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c).

At this time, the Court can now address the arguments Canadian Pacific reraises in its Motion, both of which were previously addressed in the Court's Opinion and Order on summary judgment and which the Court did not earlier reassess under the law of the case doctrine.[13] "The doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Cannon v. Armstrong Contains Inc.*, 92 F.4th 688, 701 (7th Cir. 2024) (quoting *Avitia v. metro Club of Chi., Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995)). The doctrine, however, is discretionary, "not an inflexible dictate." *Id.* (quoting *Chi. Joe's tea Room, LLC v. Vill. of Broadview*, 894 F.3d 807, 818 (7th Cir. 2018)). The Court is persuaded that it is not bound by the law of the case doctrine here for two reasons. First, the Seventh Circuit has explained that the law of the case doctrine does not apply to a summary judgment ruling which does not conclude the case:

> We could find no case . . . in which the law of the case doctrine has been applied to bind a district court to a factual statement made by the court in the course of denying a summary judgment motion, when subsequent proceedings following directly on

---

[13] As stated previously, Canadian Pacific also moved to reconsider the Court's Opinion and Order [DE 118] under Federal Rule of Civil Procedure 54(b) and, presumably, Rule 59(e). [*See* DE 181]. Canadian Pacific raises the same arguments that were presented in its Motion for Judgment on Partial Findings [DE 167]. Reconsideration, however, is not the proper vehicle in this instance because this would require the Court to reassess the Opinion and Order in light of either a manifest error of law or fact, or newly discovered evidence, the former of which the Court previously declined to do and the latter of which can more appropriately be addressed under the Rule 52 standard.

that denial bring the factual statement into doubt. And for good reason: so long as the factual issue has not been brought to judgment, the parties should be free in the course of the same proceeding to offer evidence on the issue.

*Trs. of Ind. Univ. v. Aetna Cas. & Sur. Co.*, 920 F.2d 429, 435 (7th Cir. 1990), *abrogated on other grounds by Watson v. v. Amedco Steel, Inc.*, 29 F.3d 274 (7th Cir. 1994); *see also Green v. Whiteco Indus.*, 1991 WL 542662, at *5 (N.D. Ind. Dec. 6, 1991), *aff'd*, 17 F.3d 199 (7th Cir. 1994).

And second, departure from the law of the case doctrine is justified when substantial new evidence is introduced after the first review. *See Cannon*, 92 F.4th at 701. Notably, certain pieces of evidence, such as depositions from the parties' corporate representatives, the arbitration panel's findings, and Norfolk Southern's email, were in front of the Court when the Opinion and Order were entered. At that time, however, the Court did not have the benefit of the corporate representatives' live testimony, which provided further evidence and expanded upon not only the relationship between the MTRA and the IHBIA, but the evidence before the Court at summary judgment as well. Critically, then, to answer the questions and arguments posed by Canadian Pacific in its Motion, the Court is bound by the facts, testimony, and exhibits offered in Norfolk Southern's case-in-chief.

## I.    Collateral Estoppel

The first argument raised by Canadian Pacific in its Motion and post-trial brief is whether the doctrine of collateral estoppel applies to render the IHBIA a non-perpetual agreement. [DE 167 at 2; DE 182 at 17]. Canadian Pacific asserts that Norfolk Southern previously had the opportunity to litigate the issue of whether the IHBIA and MTRA are linked during the Oil Arbitration, that the arbitration panel found that the IHBIA "is obviously related to the MTRA and plainly has an impact on the rights [Canadian Pacific] under the MTRA," and that the

22

panel's decision was confirmed in a separate judgment in federal court. [DE 167 at 2; DE 182 at 17].

Collateral estoppel, or issue preclusion, forecloses any "subsequent re-litigation of **the same fact or issue** where that fact or issue was necessarily adjudicated in a former suit and the same fact or issue is presented in the subsequent lawsuit." *Miller v. Patel*, 212 N.E.3d 639, 646 (Ind. 2023) (emphasis in original) (quoting *Tofany v. NBS Imaging Sys., Inc.*, 616 N.E.2d 1034, 1037 (Ind. 1993)). Where collateral estoppel applies, "the first adjudication will be held conclusive even if the second is constituted on a different claim." *Id.* (brackets omitted) (quoting *Tofany*, 616 N.E.2d at 1037). There are three conditions which lay the foundation for collateral estoppel: "(1) a final judgment on the merits in a court of competent jurisdiction; (2) identity of the issues; and (3) the party to be estopped was a party or the privity of a party in the prior action." *Id.* at 646–47 (quoting *Nat'l Wine & Spirits, Inc. v. Ernst & Young, LLP*, 976 N.E.2d 699, 704 (Ind. 2012), *cert. denied*, 569 U.S. 1018 (2013)). Importantly, the second condition will fail "if the issue is one that was **not actually litigated and determined**[.]" *Id.* (emphasis in original).

Consequentially, this is one such instance in which the second condition has not been met. The issue before the arbitration panel was not whether the IHBIA and MTRA were linked or contemporaneous, nor was the issue of Norfolk Southern's termination right in debate. Rather, the issue presented to the panel was what Canadian Pacific's *operating rights* were under the MTRA and IHBIA and, specifically, whether Canadian Pacific could move oil on routes premised under those agreements. True, the panel made comments regarding the closeness of these agreements and that one helped in understanding the other. But the panel never explicitly determined that to define the parties' operating rights, one *must* read both in synchronicity.

Rather, the request to read the two documents together as linked contracts is the direct issue posed here. Accordingly, the Court is unpersuaded that collateral estoppel dictates the determination of the IHBIA's perpetuality.

### II.       Contemporaneous Contract Doctrine

Moving on to the next argument raised in Canadian Pacific's motion and post-trial brief, Canadian Pacific contends that the IHBIA cannot be a perpetual agreement because it is linked and contemporaneous with the MTRA, which contains an express term. [DE 167 at 4; DE 182 at 16].

The contemporaneous document doctrine is a method of interpretation which permits courts, "on a case-by-case basis," to "construe together contracts that relate to the same transaction or subject matter, if nothing indicates a contrary intention." *Luke v. Luke*, 272 N.E.3d 553, 558–59 (Ind. Ct. App. 2025) (quoting *Care Grp. Heart Hosp., LLC v. Sawyer*, 93 N.E.3d 745, 753 (Ind. 2018)). Even if the documents were executed at different times, the doctrine may nonetheless apply so long as they are part of the same transaction or subject-matter. *Bird v. Valley Acre Farms, Inc.*, 177 N.E.3d 459, 468, 470 (Ind. Ct. App. 2021). While the doctrine does not absolutely require that the parties be the same, the doctrine "should be applied cautiously when the documents involve different parties." *Id.* at 471 (quoting *Murat v. S. Bend Lodge No. 235 of the Benev. & Protective Order of Elks of the USA and Burkhart Advertising, Inc.*, 893 N.E.2d 753, 757 (Ind. Ct. App. 2008), *trans. denied*); *Care Grp. Heart Hosp.*, 93 N.E.3d at 754 ("The critical inquiry is whether the litigant who is absent from the cast of parties to one of the agreements is nevertheless 'the same in essential respects' to a party to that agreement."). This is to ensure that assent, a basic tenet of contract formation, is not broken by imposing obligations on an entity who did not agree to those terms. *See Care Grp. Heart Hosp.*, 93 N.E.3d at 753.

Taking these components into consideration, the Court begins with the timing of these agreements. The MTRA and the IHBIA were executed only around five to six weeks apart, on June 2, 2005, and July 15, 2005, respectively. [DE 174, Ex. 6; Ex. 17]. While there appears to be some debate about when Norfolk Southern and Conrail added their signatures, with speculation that Conrail did not add its signature until sometime in 2007, [*see id.* at 142:15–143:4], this is immaterial. The effective date on each round of revisions remained the same up until the final signature was received: July 15, 2005. [*Id.* at 72:5–73:19, 110:23–111:3, 147:17–25]. The parties have not contested this fact, nor have they contested the fact that the IHBIA otherwise went into immediate effect with respect to operating on CP-509, which is telling.

Next, looking at the parties to the agreements, the MTRA was between Canadian Pacific and Norfolk Southern, [*see id.*, Ex. 6], while the IHBIA was between Canadian Pacific and IHB, with Conrail and Norfolk Southern signing on as consenting parties, [*see id.*, Ex. 17]. Importantly, though, while Norfolk Southern was only a consenting signatory with no interchange obligations or duties, unlike that of Canadian Pacific and IHB, Norfolk Southern's consent alone was essential for the agreement to be carried out. This strongly implies that Norfolk Southern's inclusion was more than a mere formality and disavows the idea that Norfolk Southern was not a "party" to the agreement.

And while IHB and Conrail were not parties to the MTRA, there are a few things worth noting. First, should the MTRA be read contemporaneously with the IHBIA, no additional obligations or provisions would be imposed on either party, particularly regarding the MTRA's termination date, thereby rectifying any concern over assent. Second, the only question at hand is whether Norfolk Southern can terminate the IHBIA as a consenting party. Any determination as to Norfolk Southern's right to terminate should not burden or otherwise impact IHB or Conrail,

neither of whom are actively seeking to terminate the agreement in this manner. Even still, IHB, as a party with operating responsibilities under the IHBIA, may nonetheless invoke the agreement's explicit termination provision. Thus, when considering the entirety of the circumstances, the Court is convinced that the analysis concerns the same essential parties to the MTRA and IHBIA.

The final consideration, then, is whether the MTRA and IHBIA cover the same transaction or subject-matter. The MTRA, as part of the MOU, was one of a series of "exchanges of value" between Canadian Pacific and Norfolk Southern in which Norfolk Southern would match the value Canadian Pacific would have received from selling the D&H Railroad property. The MTRA was designed to grant from Norfolk Southern to Canadian Pacific trackage rights from Detroit to two interchange points in Chicago: CP-502 and CP-509, the former of which was valuable for its shorter, more direct route and for providing Canadian Pacific with an alternate route to avoid traffic congestion. The MTRA specifically provides: "[Norfolk Southern] hereby grants to [Canadian Pacific] the right to operate its trains, locomotives, cars and equipment with its own crews . . . between Delray Interlocking in Detroit, MI . . . and one of the following two points in Chicago, IL . . . (i) CP-502 at Milepost 502.8± and (ii) CP-509 at Milepost 509.7±[.]" [*Id.*, Ex. 6].

Because both Norfolk Southern and Canadian Pacific understood that the requisite rights to use CP-502 could not be granted by Norfolk Southern alone, it was understood that an additional agreement (the IHBIA) would be needed to effectuate the trackage rights conferred under the MTRA. This was confirmed when both of the corporate representatives for Norfolk Southern and Canadian Pacific stated that the sole purpose for the IHBIA was to effectuate these rights. [*See id.* at 103:25–105:6. 144:23–145:18, 162:3–163:16]. Although the IHBIA does not

26

explicitly reference the MTRA by name, the trackage rights conferred under the MTRA are explicitly referenced, in which it states: "[Canadian Pacific] has received trackage rights between Eastern Canada and CP-502 for Interchange with IHB." [*Id.*, Ex. 17]. All of this together, the Court is convinced that the MTRA and IHBIA cover the same transaction or subject-matter. And with the closeness in execution time, tacked on with the overlap of the relevant parties, strong enough evidence has been presented to suggest that the MTRA and IHBIA are contemporaneous, linked documents.

Moreover, additional evidence offered during the bench trial provides even stronger credence that these documents should be read together. For example, the 2014 email from one of Norfolk Southern's executive proxies suggests that the IHBIA and MTRA are "linked" in a manner that dissuaded the possibility of amending the IHBIA. Specifically, the email states:

> Norfolk Southern is not opposed to the [*sic*] [Canadian Pacific's] request for Trackage Rights over the IHB; however, *we are not agreeable to modification of the existing Interchange Agreement for trains operating between Gibson and CP 502 as this agreement is linked with the existing Michigan Trackage Agreement* between [Canadian Pacific] and [Norfolk Southern].

[*Id.* at 151:2–9; Ex. 5 (emphasis added)]. This email was never disavowed, retracted, or abandoned in a statement outside the proceedings of this lawsuit. [*Id.* at 154:20–156:4]. Furthermore, the arbitration panel, when deciding what Canadian Pacific's operating rights were under the MTRA, recognized the importance of reading the IHBIA and MTRA together. The panel made the following statements in light of this observation:

(1) The IHBIA "is obviously related to the MTRA and plainly has an impact on the rights of [Canadian Pacific] under the MTRA; and

(2) The "prior/subsequent clause" under the MTRA does not categorically exclude the "operating rights" under the IHBIA, and because the agreements must be read as

permitting eastbound traffic on CP-502, the IHBIA's "operating rights" can properly be read as satisfying the "prior/subsequent clause" under the MTRA.

[DE 183-5 at 9, 11, 15]. While the email and arbitration panel statements alone do not show that the two agreements are contemporaneous and linked, they, in conjunction with both the statements from the parties' corporate representatives and the nature and history of the agreements, help solidify this reading.

Therefore, based on all of the above evidence presented during Norfolk Southern's case-in-chief, the Court concludes that the IHBIA is a contemporaneous writing that must be read in light of, and together with, the MTRA.

### III.    The IHBIA Is Not A Perpetual Contract and Should Be Read in Light of the MTRA's Plain Language.

Having concluded that the IHBIA and MTRA are linked, contemporaneous agreements, the question remains whether the IHBIA is a perpetual agreement that requires determining a reasonable termination date. Upon a review of the MTRA's plain language, the Court concludes that the IHBIA is not a perpetual agreement as the MTRA contains an express termination provision and date.

Section 13(b) of the MTRA describes the duration of the agreement's term, as well as the option for extension and renewal:

> This Michigan Trackage Rights Agreement shall remain in full force and effect until mutually terminated by the Parties. The Initial Term of this Agreement shall be twenty-five (25) years from the Commencement Date, and shall be renewable continuously thereafter for additional periods of ten (10) years ("Additional Term(s)"). At the end of the Initial Term, [Canadian Pacific] may, at its option, (i) extend this Agreement under the same terms and conditions for one Additional Term, or (ii) require renegotiation of the Agreement. At the end of the first (and any subsequent) Additional Term, either [Norfolk Southern] or [Canadian Pacific] may extend the Agreement under the then-current terms and conditions, or require renegotiation of the Agreement. In either case, notice to continue the then-current

terms and conditions or to require renegotiation shall be given by [Canadian Pacific] or [Norfolk Southern], as the case may be, by giving the other Party advance written notice at least six (6) months prior to the expiration of the then-current term.

[DE 174, Ex. 23 at § 13(b)]. Moreover, Section 13(c) further provides that Canadian Pacific "shall have the right to terminate this Michigan Trackage Rights Agreement upon giving [Norfolk Southern] at least thirty (30) days prior written notice of such termination. Such termination shall be considered to be a termination of both this Michigan Trackage Rights Agreement and the underlying right of movement." [*Id.*, Ex. 23 at § 13(c)]. No mention is made of Norfolk Southern's right to terminate earlier.

Accordingly, the MTRA contains an express provision detailing the term of the agreement and the grant of trackage rights to Canadian Pacific—including that which required the IHBIA to properly effectuate. Only Canadian Pacific is provided the right to terminate prior to the agreement's proper termination date. And given that the MTRA went into effect in 2005, and assuming that Canadian Pacific invokes its option to extend the MTRA for an additional ten-year period, this would mean the parties are bound by the MTRA until at least 2040.

Norfolk Southern argues that a reasonable date for termination was already provided upon issuing a notice of termination at the beginning of this suit on January 17, 2017, when it stated that it would terminate on the latter of ninety days following receipt of the notice or after this Court's judgment. [*See* DE 184 at 17]. But the Court's conclusion does not leave Norfolk Southern blindsided or without recourse. It is certainly free to terminate the MTRA, and by extent remove itself from the IHBIA, when the time comes for renegotiation in 2040. But make no mistake, even though this case has been pending for approximately ten years, the circumstances have not changed. The reasonable date for termination was 2040 when the parties

29

executed the IHBIA in 2005, it was 2040 when this suit began in 2017, and it remains 2040 today.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Canadian Pacific's Motion for Judgment on Partial Findings [DE 167], **DENIES AS MOOT** Canadian Pacific's Motion for Reconsideration [DE 181], and **DENIES** the relief sought by Norfolk Southern in its operative Complaint [DE 83]. Specifically, the Court concludes that Norfolk Southern may not terminate the IHBIA at will upon providing ninety days written notice. The Court further concludes that, following a review of the facts, the testimony and credibility of the witnesses, the exhibits presented, and the relevant law, the only reasonable time at which Norfolk Southern may terminate the IHBIA, in accordance with the MTRA, is 2040.  The Court hereby issues this Order and Opinion as a final decision in favor of Defendants and directs the Clerk to close this case.

SO ORDERED.

ENTERED: March 27, 2026

/s/ GRETCHEN S. LUND
Judge
United States District Court

30